## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

### *Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        v.<br><br>SORIN POSTOLACHE, a/ka PETER ZIMMIT, a/k/a PETER ZAMMIT and ADRIAN VASILE MARIN a/k/a ADRIAN PRICOPI, a/k/a MARIO CASTELANO, a/k/a PETER RENE, a/k/a TONI VESA,<br><br>        *Defendants*. | Case No. 1:25-MJ-632<br><br><br>__UNDER SEAL__ |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Michael Y. Jeng, being duly sworn, hereby, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2, 2017. Currently, I am assigned to the Washington Field Office–Northern Virginia Resident Agency in Manassas, Virginia, to a squad that investigates organized criminal enterprises. I have a bachelor's degree in political science, and a master's degree in security studies. I have primarily investigated a variety of financial fraud, including online or telephonic scams, international money laundering, identity theft, and bank card skimming schemes. As a result, I have training and experience understanding standard tools and techniques used in these financial crimes, including but not limited to identifying indications of a bank card skimming scheme. I have investigated a variety of complex financial crimes, which required

extensive document review, analysis and witness interviews. In addition, I have prepared and presented criminal complaints, arrests, and search warrants.

2.     The facts and information contained in this affidavit are based on my personal knowledge of the investigation, my training and experience, the observations and reports of other law-enforcement officers, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge or all facts known to the United States about this investigation.

3.     I make this affidavit in support of a Criminal Complaint charging SORIN POSTOLACHE, a/ka PETER ZIMMIT, a/k/a PETER ZAMMIT ("POSTOLACHE") and ADRIAN VASILE MARIN, a/k/a ADRIAN PRICOPI, a/k/a MARIO CASTELANO, a/k/a PETER RENE, a/k/a TONI VESA ("MARIN") with conspiracy to commit access device fraud and to traffic in device-making equipment, in violation of Title 18, United States Code, Sections 1029(b)(2), 1029(a)(2), and 1029(a)(4).

4.     More specifically, as set forth in greater detail below, as a result of a joint investigation between the United States Secret Service ("USSS") and FBI there is probable cause to believe that, from on or about November 29, 2024, to on or about February 9, 2025, POSTOLACHE and MARIN conspired to knowingly, voluntarily, and with intent to defraud, use one or more unauthorized access devices during a one-year period, and did so by conducting transactions within the Eastern District of Virginia and elsewhere with cards that had been re-encoded with debit card numbers belonging to individuals whose debit card information was unlawfully captured without authorization by electronic devices surreptitiously installed at point-of-sale terminals. Through their use of these unauthorized access devices, the defendants

defrauded victims of more than $1,000 in cash during this period. POSTOLACHE and MARIN also conspired to knowingly, voluntarily, and with intent to defraud install device-making equipment onto point-of-sale terminals throughout the Eastern District of Virginia in order to capture debit and credit card information.

## BACKGROUND ON BANK CARD SKIMMING

5.     Bank card skimming typically involves installing device-making equipment, also known as skimmers, to a debit or credit card point-of-sale terminal such as an automated teller machine ("ATM") or a customer self-checkout terminal at a retail store. Fraudsters overlay these skimmers over the slots in which a customer inserts or swipes his or her bank card in a manner that makes the skimmers inconspicuous to the customer. Oftentimes, the fraudsters will construct the skimmers in such a way that mimics parts of the point-of-sale terminal. When the cards are inserted, the skimming device copies the data from the cards' magnetic strip.

6.     In my training and experience, I know that customers typically pay with their bank cards in three ways: swiping their cards at a terminal to pay via the cards' magnetic strip, inserting their cards into the terminal to pay via the cards' security chip, or tapping their cards against a terminal to pay via the cards' wireless payment mechanism. In my training and experience and based on conversations with officers and analysts from other law enforcement agencies, I know that skimmers in general are not sophisticated enough to capture information from cards' wireless tap-to-pay features and can usually only capture the information from cards' magnetic strips and security chips.

7.     In addition to the skimmers, fraudsters will also use mechanisms to capture the personal identification numbers ("PINs") that the customers enter when using their cards. One

such way is by attaching makeshift pinhole cameras to the point-of-sale terminals to record the customers entering their PINs. Oftentimes, these cameras are also designed to be inconspicuous to customers. The skimmers and cameras store this data and footage until the fraudster returns later to retrieve them and download the data. Another technique that fraudsters use is by creating an overlay keypad that can be installed over the keypad of the point-of-sale terminal. When the customer enters his or her PIN, this overlay keypad will capture the PINs and store this information for future download. Once downloaded, certain equipment and software can be used to re-encode the data from the magnetic strip captured by the skimmer onto any card with a magnetic strip, such as a gift card or a hotel key card. The re-encoded card, in combination with the card's corresponding PIN, can then be used by the fraudsters at ATMs to access funds in the customer's account without the customer's authorization and without having to physically use the customer's card. Although skimmers may also capture information from the customer card's security chip, fraudsters typically are not sophisticated enough to re-encode it in a way that allows them to access the customer's account.

## **PROBABLE CAUSE**

### The Scheme to Defraud Navy Federal Credit Union Customers

8.     Navy Federal Credit Union ("NFCU") is a United States federal credit union that is headquartered in Vienna, Virginia. NFCU offers a variety of financial services to its customers, such as checking and savings accounts, debit and credit cards, and branches and ATMs located throughout the United States, including in the Eastern District of Virginia. NFCU is federally insured by the National Credit Union Association.

9.     NFCU informed law enforcement that all data for their ATM transactions are

4

handled by servers located in Ashburn, Virginia or Plano, Texas. Therefore, the usage of a NFCU ATM in Virginia may cause data to be sent via interstate wires, depending on the ATM.

10.    NFCU detected that in or about November and December 2024, several of its customers' debit cards appeared to have been used on back-to-back days at multiple NFCU ATMs located throughout Northern Virginia to withdraw large amounts of cash, which was unusual behavior. Several of these customers also reported to NFCU that they never lost possession of their debit cards during this time, leading NFCU to suspect that their card information had been skimmed. NFCU reviewed surveillance footage from the ATMs where these customers' cards were used and determined that their cards had been used by one of three individuals, POSTOLACHE, MARIN, and Co-Conspirator 1 ("CC-1"). [1] In some instances, these individuals were together when using the NFCU card information while in other instances they appeared to be alone. In total, NFCU determined that POSTOLACHE, MARIN, and CC-1 had used re-encoded cards containing debit card information that belonged to about eleven of its customers from about November 29, 2024, to December 24, 2024, and were successfully able to withdraw approximately $39,210.00 from the customers' accounts. Figure 1 shows the NFCU customers and the amounts that were fraudulently withdrawn from their accounts.

---

[1] At the time of NFCU's review of the security footage, these individuals' identities were unknown. As detailed later in this affidavit, law enforcement eventually determined their identities through a variety of means.

| NFCU Customer | Loss Amount |
|---|---|
| D.T.B. | $12,820.00 |
| J.J. | $650.00 |
| R.N. | $6,860.00 |
| K.W. | $6,860.00 |
| D.D.B. | $1,480.00 |
| E.B. | $2,940.00 |
| W.Y. | $800.00 |
| M.C. | $1,960.00 |
| B.P. | $1,960.00 |
| J.M. | $1,960.00 |
| K.H. | $920.00 |
| **Total** | **$39,210.00** |

**Figure 1**

11.     As an example, NFCU customer D.T.B.'s debit card information ending in -1054 was used about fifteen times by POSTOLACHE, MARIN, and CC-1 from about December 12, 2024, to December 25, 2024, at NFCU ATMs located in the Eastern District of Virginia and in Maryland to withdraw a total of $12,820.00 from D.T.B.'s account. Below are some examples of the surveillance footage that NFCU provided to law enforcement of these transactions:

a.     Figure 2 shows D.T.B.'s card information being used on or about December 12, 2024, at a NFCU ATM located in Arlington, Viriginia by POSTOLACHE. Of note POSTOLACHE appeared to be wearing a baseball cap with a white Adidas logo on the front as well as a jacket with a black and yellow pattern on its bicep and forearm areas, and solid black on its elbows, chest, and stomach areas.



**Figure 2**

b.  Figure 3 shows D.T.B.'s card information being used on or about December 20, 2024, at a NFCU ATM located in Falls Church, Virginia by MARIN. Of note, MARIN appeared to be wearing a dark-colored knit cap with a white stripe pattern.



**Figure 3**

c.  Figures 4 and 5 show D.T.B.'s card information being used on or about December 23, 2024, at a NFCU ATM located in Ashburn, Virginia by POSTOLACHE. Of note, POSTOLACHE appeared to be wearing a dark-colored baseball cap and a yellow jacket with a reflective white logo on its left chest. NFCU records indicated that this ATM was serviced by their data server located in Plano, Texas, and thus POSTOLACHE caused interstate wires to be transmitted during these transactions.



**Figure 4**



**Figure 5**

12.    The USSS interviewed D.T.B., who confirmed that he had an account at NFCU. D.T.B. stated that in late December 2024, he noticed several cash withdrawals conducted against his NFCU account over the course of several days that he did not authorize. D.T.B. had never given permission to anyone else to use his NFCU account and never lost possession of his NFCU debit card. D.T.B. was eventually reimbursed by NFCU for the unauthorized withdrawals.

13.    In another example, NFCU customer K.W.'s debit card information ending in -8416 was used about eight times from about November 29, 2024, to December 6, 2024, by POSTOLACHE, MARIN, and CC-1 at NFCU ATMs located in the Eastern District of Virginia to withdraw approximately $6,860.00 from K.W.'s account. Below are some examples of the surveillance footage that NFCU provided to law enforcement of these transactions:

a. Figure 6 shows K.W.'s card information being used on or about December 4, 2024, at a NFCU ATM located in Falls Church, Virginia. In the left of Figure 6 is MARIN while to the right is CC-1. Of note, MARIN appeared to be wearing the same knit cap with a white stripe pattern that he was wearing in Figure 3, and CC-1 appeared to be wearing the same baseball cap with white Adidas logo that POSTOLACHE was wearing in Figure 2.



**Figure 6**

b. Figure 7 shows K.W.'s card information being used on or about December 5, 2024, at a NFCU ATM located in Fairfax, Virginia by POSTOLACHE. Of note, POSTOLACHE appeared to be wearing the same dark-colored baseball cap that he was wearing in Figures 4 and 5.



**Figure 7**

14.    The USSS interviewed K.W., who confirmed that he did have a NFCU account. K.W. told law enforcement that in early December 2024 he had noticed several unauthorized withdrawals that had been conducted against his NFCU account. The withdrawals were conducted at several different ATMs in Northern Virginia. K.W. did not conduct these withdrawals and still had possession of his NFCU debit card. K.W. never gave anyone else permission to conduct these withdrawals. K.W. was eventually reimbursed by NFCU for the amount withdrawn from his account without his permission.

15.    NFCU also detected other instances of their customers' debit card information being used at ATMs without their customers' permission by POSTOLACHE and MARIN. From about January 31, 2025, to about February 9, 2025, approximately eight NFCU customers' debit card information was used without permission by POSTOLACHE and MARIN at NFCU ATMs located in Burke, Virginia and in Pennsylvania. Figure 8 below details these transactions.

| NFCU Customer | Loss Amount |
|---|---|
| D.H. | $4,000.00 |
| W.V. | $2,980.00 |
| K.G. | $1,000.00 |
| L.P. | $1,000.00 |
| K.S. | $4,000.00 |
| C.F. | $1,000.00 |
| W.L. | $980.00 |
| D.D. | $980.00 |
| **Total** | **$15,940.00** |

**Figure 8**

16.    The surveillance footage from these NFCU ATMs showed that the transactions in Figure 8 were conducted by POSTOLACHE and MARIN. As an example, all eight of the NFCU customers listed in Figure 8 had their debit card information used at a NFCU ATM in Burke, Virginia on or about January 31, 2025. The footage showed that MARIN used the card information of victims K.G., L.P., K.S., C.F., and D.H. at the ATM first (see Figure 9, in which MARIN appeared to be wearing the same blue knit cap with white stripe pattern as he wore in Figures 3 and 6). The footage showed that as MARIN was completing the last transaction, he turned his head and appeared to be speaking to someone off-screen. When MARIN finished and left the ATM, POSTOLACHE immediately appeared from the direction that MARIN had been speaking towards and used the ATM to conduct transactions with the card information of victims W.L., W.V., and D.D. (see Figure 10, in which POSTOLACHE appeared to wear the same dark-colored baseball cap that he wore in Figures 4, 5, and 7). Law enforcement believes they may have coordinated so that they were not at the ATM at the same time to not raise suspicion by bystanders.



**Figure 9**

**Figure 10**

<u>The Scheme to Defraud CVS Pharmacy Customers</u>

17.    CVS Pharmacy is a national retail chain with numerous store locations around the United States, including the Eastern District of Virginia. CVS Pharmacy stores oftentimes have self-checkout point-of-sale terminals so that customers can pay for their items without having to interact with CVS Pharmacy staff.

18.    On or about December 24, 2024, staff at a CVS Pharmacy store located in Maryland found a skimmer on a self-checkout point-of-sale terminal.[2] This prompted CVS Pharmacy staff

---

[2] To date, law enforcement has not been able to determine if this skimmer was related to the subjects of this investigation or if it was installed by a different fraudster.

at several stores in the Washington, D.C. metropolitan area, including Northern Virginia, to check their self-checkout terminals over the course of the next several days for additional skimmers. From about December 31, 2024, to January 8, 2025, staff at eleven CVS Pharmacy stores located in Burke, Fairfax, Warrenton, Vienna, Front Royal, Gainesville, Springfield, and Annandale, Virginia, each discovered that one of their self-checkout terminals had a skimmer installed. The staff removed these devices and turned them over to the custody of local law enforcement, who in turn notified the USSS. Currently, the USSS has custody of nine of the eleven skimmers found from these stores. The remaining two skimmers are still in the custody of the local police department that initially recovered them.

19.     Law enforcement observed that the skimmers were designed to be placed over the keypads and magnetic strip readers of the CVS Pharmacy store self-checkout terminals. As an example, Figure 11 below is a photograph taken by CVS Pharmacy staff from the store located in Warrenton, Virgina of the skimmer after it was removed.



**Figure 11**

20.    As another example, Figure 12 below shows a skimmer as it was being removed from one of the CVS Pharmacy stores located in Fairfax, Virginia.



**Figure 12**

21.    Staff at these CVS Pharmacy stores reviewed their store's internal surveillance footage and discovered that the skimmers were all installed on December 28, 2024, and December 31, 2024, by two individuals that law enforcement later determined were POSTOLACHE and MARIN. Law enforcement reviewed this footage and observed the following:

a.  On or about December 28, 2024, at approximately 12:49pm, MARIN and POSTOLACHE entered the CVS Pharmacy store located at 337 East Maple Street, Vienna, Virginia 22180. MARIN appeared to be wearing the same blue knit-cap with white stripe pattern while POSTOLACHE appeared to be wearing the same dark colored baseball cap and yellow jacket with a white logo on its left chest (see Figure 13). The two went to a self-checkout terminal with a few items to purchase. MARIN stood to the side as if to block the view of the terminal from other customers while POSTOLACHE ripped off the keypad cover from the terminal and placed it in his

14

pocket. Then, POSTOLACHE took a dark-colored object from his pocket and pushed it against the keypad of the terminal. Law enforcement believes that this was the skimmer that CVS Pharmacy staff recovered. The two then completed their purchase and departed the store.



**Figure 13**

b. On or about December 28, 2024, at approximately 1:21pm, the two entered a CVS Pharmacy store located at 264 Cedar Lane SE, Vienna, Virginia 22180. While at the self-checkout terminal, POSTOLACHE again took a dark object from his pocket and pressed it against the keypad while MARIN appeared to block the view of other customers. After pressing the object against the keypad, POSTOLACHE continued to press against the object for a few seconds as if to ensure that it was secure and would not fall off.

15

c.  On or about December 28, 2024, at approximately 1:42pm, the two entered a CVS Pharmacy store located at 8124 Arlington Boulevard, Falls Church, Virginia 22042. While at the self-checkout terminal, POSTOLACHE again ripped off the keypad cover, took a dark object out of his pocket, and pressed it against the keypad while MARIN appeared to block the view of other customers.

d.  On or about December 28, 2024, at approximately 2:02pm, the two entered a CVS Pharmacy store located at 7205 Little River Turnpike, Annandale, Virginia 22003. While at the self-checkout terminal, POSTOLACHE again ripped off the keypad cover from the keypad before MARIN left to retrieve another item in the store. While POSTOLACHE was at the terminal alone, he did not touch the terminal and appeared to wait for MARIN to return. After MARIN returned, POSTOLACHE then took a dark object from his pocket and pressed it against the terminal, indicating to law enforcement that he was likely waiting for MARIN to block the view of other customers before installing the skimmer.

e.  On or about December 28, 2024, at approximately 2:53pm, the two entered a CVS Pharmacy store located at 9582 Old Keene Mill Road, Burke, Virginia 22015. While at the self-checkout terminal, POSTOLACHE again ripped off the keypad cover, took a dark object from his pocket, and pressed it against the keypad while MARIN blocked the view of other customers.

f.  On or about December 28, 2024, at approximately 3:31pm, the two entered a CVS Pharmacy store located at 11003 Main Street, Fairfax, Virginia 22030. While at the self-checkout terminal, POSTOLACHE again ripped the keypad cover off, took a dark

16

object from his pocket, and pressed it against the keypad while MARIN blocked the view of other customers. Law enforcement believes this was the skimmer pictured earlier in Figure 12.

g.  On or about December 28, 2024, at approximately 3:53pm, the two entered a CVS Pharmacy store located at 12734 Shoppes Lane, Fairfax, Virginia 22033. While at the self-checkout terminal, POSTOLACHE and MARIN went to purchase what appeared to be magazines at a self-checkout terminal. MARIN held up the magazines while POSTOLACHE scanned them with the terminal's hand-held scanner. As MARIN continued to hold up the magazines as if to block other customers' view of the keypad, POSTOLACHE took a dark object from his pocket and pressed it against the keypad before resuming scanning the magazines.

h.  On or about December 28, 2024, at approximately 4:50pm, the two entered a CVS Pharmacy store located at 13031 Route 50, Fairfax, Virginia 22033. While at the self-checkout terminal, POSTOLACHE again ripped the keypad cover off, took a dark object out of his pocket, and pressed it against the keypad while MARIN blocked the view of other customers.

i.  On or about December 31, 2024, at approximately 1:00pm, the two entered a CVS Pharmacy store located at 800 John Marshall Highway, Front Royal, Virginia 22630. MARIN appeared to be wearing the same baseball cap with white Adidas logo on the front that POSTOLACHE wore in Figure 2 and that CC-1 wore in Figure 6, while POSTOLACHE appeared to wear the same dark-colored baseball cap that he wore in Figures 4, 5, 7, 10, and 13 (see Figure 14, below). While at the self-checkout terminal,

17

POSTOLACHE ripped the keypad cover off, took a dark object from his pocket, and pressed it against the keypad while MARIN blocked the view of other customers.



**Figure 14**

j.   On or about December 31, 2024, at approximately 1:50pm, the two entered a CVS Pharmacy store located at 510 Blackwell Road, Warrenton, Virginia 20186. While at the self-checkout terminal, POSTOLACHE ripped the keypad cover off, took a dark object from his pocket, and pressed it against the keypad while MARIN blocked the view of other customers. Law enforcement believes that this was the skimmer pictured earlier in Figure 11.

k.   On or about December 31, 2024, at approximately 2:24pm, the two entered a CVS Pharmacy store located at 14380 McGraws Corner Dr., Gainesville, Virginia 20155. While at the self-checkout terminal, POSTOLACHE ripped the keypad cover off, took a dark object from his pocket, and pressed it against the keypad while MARIN blocked

the view of other customers.

22.    Law enforcement is attempting to analyze these eleven recovered skimmers to determine how many sets of debit or credit card information they had captured. Given that the skimmers were not removed by CVS Pharmacy staff for at least a few days, and in some instances over a week, since their installation, law enforcement believes that each skimmer may have potentially captured dozens, if not hundreds, of sets of card information each. As an example, CVS Pharmacy staff from the store located at 8124 Arlington Boulevard, Falls Church, Virginia 22042 reported to law enforcement that they did not find and remove the skimmer found at their store until on or about January 8, 2025.

<u>Identification of POSTOLACHE</u>

23.    Law enforcement identified POSTOLACHE through a variety of means. When NFCU detected the apparent skimming attempts against their customers, they sent images of POSTOLACHE, MARIN, and CC-1 captured by their ATM surveillance to law enforcement agencies throughout the United States and asked if anyone could identify them. A law enforcement agency in Tennessee used a commercially-available facial recognition program and discovered that POSTOLACHE likely had a Facebook account with the username "sorin.postolache.7". The USSS and FBI received information voluntarily provided by Wells Fargo that showed that POSTOLACHE held an account there. The USSS and FBI obtained additional information from Wells Fargo showing that this account ended in -4602 and was held in POSTOLACHE's true name. The USSS and FBI were also able to obtain POSTOLACHE's date of birth, Romanian passport number, and New York driver's license number from Wells Fargo. The USSS and FBI then obtained POSTOLACHE's New York driver's license photograph, and it appeared to match

the images of POSTOLACHE as captured by NFCU and CVS Pharmacy surveillance footage.

24.    Law enforcement obtained additional records from Wells Fargo account -4602, including bank statements and surveillance footage from Wells Fargo ATMs. The statements showed that transactions were made with this account in a variety of states; however, in November and December of 2024 and January of 2025 transactions were made in Northern Virginia, which corresponded to the time frame in which POSTOLACHE was seen in Northern Virginia on NFCU and CVS Pharmacy surveillance footage.

25.    For example, Wells Fargo account -4602 showed that on or about December 31, 2024, two transactions were authorized at a non-Wells Fargo ATM located at 851 John Marshall Highway, Front Royal, Virginia 22630. According to Google Maps, this location is less than 0.1 miles away from the CVS Pharmacy store located at 800 John Marshall Highway, Front Royal, Virginia 22630 in which POSTOLACHE and MARIN were seen on or about December 31, 2024, in Figure 14.

26.    In another example, Wells Fargo account -4602 showed that on or about December 23, 2024, a purchase was made at the A-Plus #76 gas station in Ashburn, Virginia. Law enforcement researched this gas station online and found that it has an address of 43740 Parkhurst Plaza, Ashburn, Virginia 20147. According to Google Maps, this address is approximately 1.3 miles away from the NFCU ATM[3] in Ashburn where POSTOLACHE was seen on or about December 23, 2024, in Figures 4 and 5.

27.    Wells Fargo ATM surveillance footage also appeared to show POSTOLACHE making deposits into his account wearing the same clothing that he could be seen wearing in NFCU

---

[3] According to the NFCU, this ATM has an address of 44315 Ice Rink Plaza, Ashburn, Virginia.

and CVS Pharmacy surveillance footage. Figure 15 below was taken from a Wells Fargo ATM located in Vienna, Virginia on or about January 1, 2025, in which POSTOLACHE can be seen making a deposit into his account wearing what appeared to be the same jacket with a black and yellow pattern on its bicep and forearm areas, and solid black on its elbows, chest, and stomach areas that he wore in Figure 2.



**Figure 15**

28.    Wells Fargo ATM surveillance footage also showed POSTOLACHE making a deposit into his account at an ATM located in Annandale, Virginia on or about November 30, 2024. Figure 16 shows POSTOLACHE wearing the same yellow jacket with white logo on its left chest that he could be seen wearing in Figures 4, 5, and 13.



**Figure 16**

Identification of MARIN

29.    After NFCU had distributed images of MARIN to law enforcement with a request to identify him, law enforcement officers at the Fairfax County Police Department ("FCPD"), located in Fairfax County, Virginia, and Homeland Security Investigations ("HSI") identified MARIN as ADRIAN VASILE PRICOPI by comparing NFCU's images against Department of Homeland Security ("DHS") immigration records from when he entered the United States. USSS provided the name ADRIAN VASILE PRICOPI and his date of birth to law enforcement in Romania, who confirmed that ADRIAN VASILE PRICOPI, a Romanian citizen, had changed his name to ADRIAN VASILE

MARIN. Romanian law enforcement provided USSS with MARIN's Romanian passport photograph. They also informed the USSS that he likely used a Facebook account with the username "jok.adrian". The USSS and FBI observed that MARIN's Romanian passport photograph appeared to match the images of MARIN as captured by NFCU and CVS Pharmacy surveillance, and that the publicly-viewable images on Facebook account "jok.adrian" depicted an individual that also matched MARIN's appearance.

30.     Law enforcement also found that MARIN and POSTOLACHE were likely using false identities to conduct their skimming operations. When examining Wells Fargo account -4602, law enforcement noticed that it received a payment on or about June 20, 2025, from an individual named MARIO CASTELANO ("CASTELANO"). Law enforcement researched CASTELANO in government databases and discovered that numerous packages were mailed to CASTELANO from various overseas locations, most of which were in China and Hong Kong, from about August 20, 2024, to May 21, 2025. The packages were declared to contain various electronic devices, and CASTELANO had received them at a rented mailbox in Brooklyn, New York ("MAILBOX 1").

31.     On or about May 22, 2025, CBP examined one of these packages after it arrived at its U.S. port of entry and found that it contained electronic components that could be used to make skimmers, including card magnetic strip readers. CBP determined that these items were prohibited and seized them. Following this incident, CBP records showed that CASTELANO continued to receive shipments from overseas in July and August 2025, except CASTELANO received them at a residential address of 222 Covert Street, Second Floor, Brooklyn, New York 11207 ("RESIDENCE 1").

32.     CBP    records    showed    that    CASTELANO    used    the    email    address

MARIOCASTELANO2024@GMAIL.COM and a telephone number ending in -9844. CBP records also showed that this email address and phone number were also being used by the following three individuals to receive shipments from overseas with declarations of electronic devices:

    a.   PETER RENE ("RENE") received shipments to a rented mailbox ("MAILBOX 2") in Brooklyn, New York in or about April and May 2025.

    b.   PETER ZAMMIT ("ZAMMIT") received shipments to a rented mailbox ("MAILBOX 3") in Brooklyn, New York from about February 17, 2025, to April 8, 2025.

    c.   TONI VESA ("VESA") received shipments to a rented mailbox ("MAILBOX 4") in McLean, Virginia from about May 9, 2023, to January 24, 2025.

33.    Like with CASTELANO, CBP had previously examined some of the packages that were sent to RENE, ZAMMIT, and VESA and seized their contents because they were determined to contain electronic devices or hardware that could be used to construct skimmers. These included pinhole cameras (seized on or about January 20, 2025, in a shipment for VESA), and ATM facias that could be used to attach skimming components to and placed over ATM keyboards (seized on or about April 25, 2025, in a shipment for RENE and on or about May 20, 2025, in a shipment for ZAMMIT).

34.    Law enforcement obtained information from MAILBOX 1, MAILBOX 2, MAILBOX 3, and MAILBOX 4, including copies of the identification documents that their renters used to rent them. Law enforcement discovered that CASTELANO used an Italian passport with a number ending in -0745 and an Italian identification card ending in -544G to rent MAILBOX 1, RENE used a Danish passport to rent MAILBOX 2, and VESA used a Finnish passport to rent

24

MAILBOX 4. The passport photographs of RENE and VESA appeared to match the images of MARIN as seen on NFCU and CVS Pharmacy surveillance footage, as well as MARIN's Romanian passport photograph. The photographs for CASTELANO's Italian passport -0745 and identification card -544G were too blurry for law enforcement to discern facial features, but the outline of the individual's face on both appeared to match that of MARIN's.

35.     Law enforcement also discovered that MAILBOX 3 had been rented with a Maltese passport in the name of PETER ZIMMET ("ZIMMET") and that ZIMMET's passport photograph appeared to match the images of POSTOLACHE as seen on NFCU and CVS Pharmacy surveillance footage. This led law enforcement to believe that ZIMMET and ZAMMIT were aliases that POSTOLACHE used to rent MAILBOX 3 and to receive shipments from overseas that contained components to construct skimmers.

36.     Law enforcement researched CASTELANO, RENE, and VESA in government databases and could not locate records that showed they entered the United States. Law enforcement also researched Italian passport -0745, Danish passport -0836, and Finnish passport -4303 in government databases and could not locate records that showed CASTELANO, RENE, or VESA, respectively, used them to enter the United States. Law enforcement also confirmed that Italian passport -0745 had been issued by the Italian government to an individual that was not named CASTELANO and who did not look like MARIN. This led law enforcement to conclude that CASTELANO, RENE, and VESA were false identities. Law enforcement also researched CASTELANO in government databases and discovered that he likely held an account at Bank of America ending in -0061. Law enforcement obtained information from Bank of America for account -0061, which confirmed that it was held in CASTELANO's name.

37.    Law enforcement examined bank statements for account -0061 for about August 2024 to August 2025. All the deposits into account -0061 were made at ATMs located in New York except for those made in late October, November, and December 2024, and in January and early February 2025. These deposits were made at ATMs in Northern Virginia, including in Vienna, McLean, Annandale, Springfield, and Ashburn, Virginia, which corresponded to the time frame in which MARIN was seen in Northern Virginia in NFCU and CVS Pharmacy surveillance footage.

38.    Account -0061 was also used to make a payment on or about March 17, 2025, to the store that owned MAILBOX 4, which was held in VESA's name.

39.    Account -0061 also received several Zelle payments from an "ADRIANVASILE MARIN" in or about May 2025 and sent a Zelle payment to a "SORIN POSTOLACHE" on or about June 20, 2025. It also exchanged several Zelle payments from a "PETER RENE" from about April to July 2025.

40.    When examining bank statements for POSTOLACHE's Wells Fargo account -4602, law enforcement also saw that, on or about August 25, 2025, POSTOLACHE had received an electronic transfer of funds from an "Adrianvasile Marin".

41.    When examining Bank of America account -0061, law enforcement also observed numerous purchases made with the vehicle rental company Turo, Inc. Law enforcement served a federal grand jury subpoena to Turo, Inc. regarding CASTELANO's account, which confirmed that CASTELANO did have an account with Turo, Inc. As part of his account, CASTELANO sent Turo, Inc. a picture of his Italian identification card -544G (the same identification card used to rent MAILBOX 1), a selfie-style picture of himself, and a picture of himself holding card -544G.

Law enforcement observed that CASTELANO's Turo, Inc. pictures matched that of MARIN as seen on NFCU and CVS Pharmacy surveillance, and on MARIN's Romanian passport photograph. The image of card -544G was also clearer than that provided by the owner of MAILBOX 1, and law enforcement observed that CASTELANO's picture on card -544G matched that of MARIN's.

42.    Given that MARIN's image was on the passports for CASTELANO, RENE, and VESA, and that the Romanian authorities confirmed to the USSS that MARIN was a Romanian national, the USSS and FBI concluded that MARIN's true identity was MARIN and that he was using the CASTELANO, RENE, and VESA false identities in furtherance of his skimming scheme with POSTOLACHE and other co-conspirators. In my training and experience, I know that fraudsters oftentimes use false identities when conducting actions in furtherance of fraud schemes, such as renting mailboxes or opening bank accounts, to evade detection by law enforcement. That CASTELANO's Bank of America account -0061 showed ATM deposits in Northern Virginia during the timeframe that MARIN was observed conducting skimming operations at NFCU and CVS Pharmacy, and that the account showed ATM deposits in New York at all other times, provides additional evidence of MARIN's involvement in this conspiracy.

RESIDENCE 1

43.    When examining bank statements for POSTOLACHE's Wells Fargo account -4602, law enforcement observed several purchases made with Turo, Inc. Law enforcement obtained information from Turo, Inc. related to these purchases, which confirmed that they were for vehicle rentals and were made in POSTOLACHE's true name. Turo, Inc. also provided the license plates of several vehicles that POSTOLACHE had rented in May, June, and July 2025. Law enforcement researched these license plates in license plate reader databases, which showed

that they had all been observed parked on or near the same block as that of RESIDENCE 1 on May 13, 2025, at 12:49am; on June 3, 2025, at 2:53am; and on July 25, 2025, at 7:39pm.

44.    Law enforcement served a 2703(d) order to Meta Platforms, Inc. for information pertaining to MARIN's "jok.adrian" Facebook profile, which showed that it had been associated with an Internet Protocol ("IP") address on or about July 23, 2025. Law enforcement researched this IP address on open sources, which showed that its provider was Verizon. Law enforcement served a federal grand jury subpoena to Verizon regarding this IP address, and Verizon provided information that showed it was used on or about July 23, 2025, by a Verizon customer with the address "222 Covert Apt Rear Brooklyn, NY 112070000." Verizon also provided the customer's name, which was not POSTOLACHE or MARIN. Law enforcement conducted research on open sources, including on New York City's Department of Finance online Property Information Portal website, and determined that this person was the owner of 222 Covert Street, Brooklyn, New York 11207, including the second floor (RESIDENCE 1). This led law enforcement to believe that POSTOLACHE and MARIN were likely renting RESIDENCE 1.

45.    On or about August 25, 2025; September 3, 2025; October 7, 2025; and October 17, 2025, law enforcement conducted surveillance on RESIDENCE 1. In all four instances, law enforcement observed MARIN and POSTOLACHE entering and exiting the front door of RESIDENCE 1.

## CONCLUSION

46.    I respectfully submit that this affidavit supports probable cause to believe that, from on or about November 29, 2024, to on or about February 9, 2025, in the Eastern District of Virginia and elsewhere, POSTOLACHE and MARIN did knowingly and with intent to defraud violate 18

U.S.C §§ 1029(b)(2), (a)(2), and (a)(4) (conspiracy to commit access device fraud and to traffic in device-making equipment). During this time period, POSTOLACHE and MARIN conspired together to compromise at least approximately nineteen NFCU accounts, caused or attempted to cause more than $1,000 dollars in losses to these accounts, and installed eleven skimmers to self-checkout point of sales terminals at CVS Pharmacy stores located in the Eastern District of Virginia.

Michael Y. Jeng
Special Agent
Federal Bureau of Investigation

Reviewed by:

Sworn to and subscribed before me this 5th day of November, 2025.

Lindsey R Vaala    Digitally signed by Lindsey R Vaala
Date: 2025.11.05 09:46:01 -05'00'

The Honorable Lindsey R. Vaala
United States Magistrate Judge

29